We'll hear argument first this morning in Case 13-193, Susan B. Anthony List v. Stephen Driehaus. Mr. Carvin. Mr. Chief Justice, and may it please the Court, under this Court's straightforward precedent, this case presents a clearly ripe and justiciable controversy. All agree the test is whether or not there's a credible threat of enforcement. Here we know that there's a credible threat of enforcement because the Commission's probable cause panel in 2010 said that the speech at issue probably violated Ohio's false statement law. Since an enforcement agency has already told us that this statement probably violates their law, we obviously face a clear and very credible threat of enforcement if we repeat those statements as we alleged we would do. Are you making that argument on behalf of the other organization, Susan B. Anthony List? You have accurately described what occurred. But the other organization has never been charged before the Ohio Election Commission. Is there any reason to believe anybody's going to lodge a complaint against it? Well, Your Honor, when they filed their complaint, they alleged that they had not spoken those words because Susan B. Anthony had already been drawn into the Commission's procedures and the Commission had already found probable cause. So since Susan B. Anthony had already been drawn into the Commission's procedures and the Commission had already found probable cause, how is that any different from the people in Younger who the Court dismissed as having no standing because they hadn't been prosecuted, despite the same identical claim? They were chilled, they might intend to do something similar, et cetera. Well, as Justice Brennan put it in Younger, the speech that the other three speakers were going to engage in was not even of the same genre as that of the person who was being prosecuted, which is why the Court quite correctly said that their chilling effect was based on an imaginatory or speculative fear of enforcement, whereas here, Coast was going to say precisely the same words that SBA had already been found to have probably violated the false statement law. So it's hardly imaginary or speculative. I thought that the Court in Younger said, with respect to those other three, that they had never been threatened with prosecution. I don't recall it made a distinction on the basis of what they wanted to talk about. Well, two of the people were labor picketers that had never been threatened, and one was somebody who was simply teaching Marx in a classroom environment. They were quite distinct from the speaker who had been prosecuted under the incitement to violence law. And again, Justice Brennan looked at their statements, compared them to the statements of the person who had been prosecuted, and said they're not even of the same genre. So we're not arguing that somebody could come in here and argue that anything that's controversial creates a credible threat of enforcement, but we've got a very specific concrete example. Speaker A says X, that's found to have a probable cause. Speaker B quite reasonably thinks if they've just dragged Speaker A in front of this commission and the commission has found probable cause, there's no reason in the world to think that we won't be brought in. Ginsburg. But the one question is who is the threat. Now, it might be that Susan B. Anthony List is considered a group with real clout, so a candidate might be really concerned about Susan B. Anthony's speech. But the other organization maybe is not as well funded, and the candidate says, well, a lot of things are said in political campaigns, I'll let this one go, this one doesn't hurt me as much. Two points, Justice Ginsburg. First, Driehaus had shown a very avid – he was in the middle of a very tough reelection campaign, and he had shown he was going to take all the steps he could to squelch this notion that he supported taxpayer abortions. He had already spent all the money in terms of SBA List, so it literally – all he'd have to do is Xerox it to come after Coase. But I think the key point here is we don't have to negative every conceivable hypothetical on why Driehaus might not do this and the commission might not do that. There's a presumption that if you have violated the laws, as the probable cause panel said we probably had, that the agency is going to enforce the law. If you require us to negative every hypothetical, then the only way to test that hypothesis is to engage in the speech. Sotomayor, I want to share this with Clapper. Why isn't this as speculative as Clapper? You have to assume first that there's a candidate who is going to react by initiating an action. You have to assume further that a panel is going to render the same decision. And you have to assume even further that a Federal prosecutor – that the prosecutor is going to agree and actually bring the case. Well, those are the steps that are required to put my clients in jail. But we suffer Article III injury well before any prosecutor prosecutes us. Once a complaint is filed, then we are subjected to very serious costs and risks of litigation in front of the commission. And in the middle of an election campaign, during the crucial weeks when we're trying to get our speech out, this Court – The Speaker doesn't want to appear before the commission. He can be served with a subpoena which is judicially enforceable. There's two things, Justice Kennedy. At the initial stage, if we don't respond to the complaint, the commission's regulations make it clear that they may well view that as a default judgment and enter a judgment against us right away. Once the probable cause determination comes down, you have all these kinds of subpoenas and very intrusive discovery of the sort you had in our case, where they asked for our communications with everybody on the right wing of the political aisle, where we have to reveal our internal communications as well as those of others. Kennedy Now, the State can characterize its own position, but do you understand the State to say that, well, the existence of the commission means that frivolous claims can be washed out, that they can actually get some protection by an advanced ruling? Is that the State's position? No, neither. The commission has argued that, and the Attorney General, Zemeckis, on our side, makes it quite clear that there is no provision for doing it. If you read their rules, they have to go to a probable cause hearing in three days. There's literally no opportunity to wipe out so-called frivolous claims. I mean, I thought their position was that this would sharpen the controversy and make it more concrete or something like that. That's precisely right. They're arguing the whole point of this statute is some kind of truth-telling function, so they want to say that. There is a provision for an advisory opinion, and that's a question, as you are arguing so strenuously, that this statute violates the Constitution. You could have asked the commission for an advisory opinion saying that the statute had been enforced, but you didn't do that. No, we didn't, because we think that's unconstitutional. Our constitutional claim here is the ministry of truth has no ability to judge our political speech as falsity. So obviously, we wouldn't have subjected ourselves voluntarily to the ministry of truth before we decided to challenge their constitutional validity. Then we would have been inflicting the constitutional injury on ourselves. And even the commission recognizes that the declaratory judgment advisory opinion procedure doesn't work in the heat of an election campaign as it was here. But please. Kagan. Is your argument dependent on the following two facts, first that there was a probable cause determination and the second, that the Susan Anthony Group and the other group wanted to repeat the exact same statement? Are those the two things that ground your argument? We think that makes it all but dispositive, yes, that it's possible not to find a credible threat, given those two facts. They had found the speech probably violated the Ohio election statute. And, two, we were going to say exactly the same thing. So if – I'm sorry. Well, I just want to make it clear that the threat of enforcement is particularly acute here, because not only is enforcement power handed to a group of elected officials with certain ethical and political accountability things, any one of our political opponents is empowered under the statute to bring us in front of the commission. So all they have to do is Xerox the Driehaus complaint, Xerox the probable cause finding and Xerox a district court finding that said our speech was untrue. So since there are millions of people who are deputized under the statute, who have every political motivation to squelch our speech before a campaign, then I think that's the case. Kagan. But that would suggest something even broader. That would suggest that even in the first instance, before the probable cause determination was made, Susan Anthony would know that it's going to be speaking about a very controversial subject on which some people will think it's telling the truth and other people will think it's lying and that there's a very good chance that somebody is going to bring this to the commission. So that would suggest that they have standing even at that moment before the initial probable cause determination is made. Justice Kagan, we can agree that given the amorphous nature of this prohibition and the false statement, it's difficult to predict in advance who and when is going to do it. But to return to my prior answer, all of that ambiguity is gone once the expert agency has already told you that there's a probable cause to believe it violates it. So this separates us from every other speaker who is simply concerned that they will be brought in front of the commission. We have an identifiable track record that we have been brought in front of the commission. And in that regard, I would point out that the Secretary of State is obliged to refer anything to the commission if he has — should know that there's a violation. Well, in the wake of the probable cause panel's prior probability determination, it would seem that he's either ethically obliged to file a complaint against us, or at least there's a very high likelihood that he would. And again, I don't want us to lose sight of the other side of the calculus, which is that if we have to prove all of these hypotheticals with certainty, if we have to engage in more than the presumption that the State will enforce its own laws, you have created an insoluble dilemma for speakers, because you have created a dilemma where you have conditioned their access to the political marketplace of ideas on a very serious threat of being dragged into this process. Sotomayor, let me ask you something, going back in part to Justice Kagan. Basically, as a bottom line, do you think there's nothing that can be salvaged from this process? Presumably, you think that even if your client speaks a falsehood, it still chills improperly? We think that if the commission is going to drag us in front of them to justify our political speech to a bunch of State officials, that they – that is, A, Article III cognizable injury, and, B, unconstitutional. I was explaining to Justice Ginsburg. Scalia, you're not asking us to resolve the constitutional question, just the question of whether you can raise the constitutional question. All we're trying for is our day in court so we can make this argument. And I was just explaining to Justice Ginsburg that that's a reason we wouldn't involuntarily invoke a procedure that we are about to challenge as constitutional. It would be cutting off our nose to spite our face. And I also would like to point out that this is election speech, and that has two very significant components to it. One is that it's obviously at the core of the First Amendment. This is how we choose our representatives in our democracy. But it also has an extraordinarily short shelf life. No one is listening to election speech, hardly at all, 60 days before an election. And the day after the election, no one either speaks or listens. So you have about a two-month window where you can make these election speech points, which means two things. One is any distraction during that crucial period, as this Court noted in Wisconsin Right to Life, really does constitute a serious Article III injury. But the other point is you're never going to be able to adjudicate it within that 60-day window, right? You're never going to go from complaint to final judgment, which means that the speech will become arguably moot after the election, in which case you go to the capable of repetition, yet evading review exception to mootness, which is essentially the same kind of prediction of future activity that's implicated here. If you adopt the extraordinarily draconian requirements that the Sixth Circuit imposed on credible threat, this means that you will literally never be able to challenge restrictions on election speech, right? Before the campaign will be premature. During the enforcement proceeding, Federal courts have to abstain under Younger, and afterwards it will be deemed moot and then no possibility of capable of repetition, yet evading review. So you have this regime, which has existed for decades in Ohio, where they continue to impose very serious burdens on speakers on what we consider a facially unconstitutional law, yet it has consistently evaded judicial review precisely because the short time frames of the election. Ginsburg. Why did you say it would be found capable, not capable of repetition? It seems to me that you were quite right to say before that this is most capable of repetition. Oh, if you accept our view of credible threat, then you're entirely right. We would satisfy both the ripeness standard and the capable of repetition, yet evading review standard. What I was trying to point out was that if you adopt the weak, what we consider absurdly high straightjacket that the Sixth Circuit imposed on speakers trying to bring to pre-enforcement challenges in the First Amendment context, that will essentially guarantee that these things are never brought, because by the time the election is done, then you'll have a mootness argument and you won't be able to satisfy the capable of repetition, yet evading review standard. So you will have put us in this Catch-22 endless cycle of suppressing speech, deterring speech, chilling speech, but never being able to get to a court to adjudicate our First Amendment rights. Kennedy, your best cases, you think, are Steffel and Thompson and Babbitt? Are there others that are more harmful? Well, Babbitt is certainly the most on point, because there the prohibition was, like ours, was saying something untrue, something false. And it's very important to note that the plaintiff in Babbitt neither specified what they were going to say in the future, it didn't specify what company it was going to bring this consumer publicity campaign against, and it especially disavowed any intention to say anything false. But nonetheless, the Court found that a credible threat was certainly impending, was the phrase they used. And I also think the Court's recent decision in Holder is quite on point there. There the plaintiffs didn't say that they were subject to the statute. They adamantly denied that the statute even read them, reached them. They weren't bringing a facial challenge, as we are. They were bringing an as-applied challenge to the statute. And there had never been a prior threat by any expert agency that their activities were going to be monitored. I think American Booksellers is an excellent case as well, Justice Kennedy. There, there had been no argument, there had been no prior threat of enforcement. The State adamantly denied. Sotomayor, so please define for me the rule you'd like us to announce. What's a credible threat? The narrowest rule and the only rule we need to survive is that if the enforcement agency has previously announced that your speech probably violates the law at issue, then you have a credible threat of future enforcement if you repeat that speech. I think. Do we need them to say they are going to, even though the person who they said it against is not running again? Oh, well, two points on that. How do you deal with Golden, in other words? Oh, yeah. Well, Golden was very simple. All the speaker there was concerned about was that one representative. We were not concerned about Representative Driehaus as such. We're concerned about people who supported the ACA's taxpayer-funded abortion, which is a politically salient issue to this day. We mentioned Representative Kaptur as well as Representative Driehaus in one of the first false statements that's already been brought in front of the commission. And in 2010, Sherrod Brown was on the ballot for the Senate, and he also was an ACA supporter. So our complaint was not candidate-specific. It didn't turn on any personal attribute of Representative Driehaus. It turned on people who were supporting the ACA because of its taxpayer-funding abortion provisions. And that remained politically salient, and candidates who had engaged in precisely the same act as Representative Driehaus were on the ballot again in 2012. So that is our basic argument. So that you've been prosecuted before and that you are intending to do the identical speech against others. A preliminary finding and identical speech, we think, more than satisfies the credible threat thing. For the reasons I was articulating to Justice Kennedy a few moments ago, we think this far exceeds the showing that was required in Holder, Babbitt, American Booksellers, and a number of other cases as well. Do you think this is a matter of standing or ripeness? The Sixth Circuit said ripeness. In all candor, Justice Ginsburg, I can't figure out the difference between standing and ripeness in this context. No question that we are being subject to something. I think the question is whether or not the threat is sufficiently immediate. I think people tend to think about that as a ripeness issue, but I think all of the Court's teachings on standing and immediacy of injury from the standing cases apply equally here. So I would view standing and ripeness in this context as essentially coextensive. And I think the Sixth Circuit was wrong for both reasons. Roberts. Do you want us to just forget about the disclaimer issue and the commission procedure issue or even the as-applied issue? I got the sense from particularly footnote 7 in your reply brief that you're happy to just have those taken off the board. Can we take them one at a time? The disclaimer issue, Ohio agreed with us, so I think they took that off the table. The procedure issue is inextricably intertwined with our Alvarez argument that being subject to a process where the State is determining the truth of our speech, we weren't saying the procedures in the abstract were problematical. In terms of the as-applied challenge, we do disagree with the Solicitor General. We think that's certainly fit for review, just as the as-applied challenge was in Holder and in American Booksellers and in Babbitt. I do, in candor, and I think this is what the footnote the Chief Justice was referring to, goes to, as a practical matter, we don't care. Frankly, the as-applied challenge was basically saying, look, even if the law is constitutional as applied to basic assertions of fact, it's not constitutional as applied to opinions. We think Alvarez has essentially eliminated that distinction because the speech at issue in Alvarez was a pure assertion of fact. Frankly, the district court that we're going to go back to if we prevail here has already ruled that our interpretation of the ACA was an assertion of fact. So as a practical matter, it has no consequence. We're going to go back, make a facial challenge that B-9 and B-10 are facially unconstitutional under Alvarez. There's no — we're not asking for any savings, constructions, or a limited application. So it would be a pure question of law that is fit for immediate review, and as I say, we need — if we do prevail here on justiciability, we need to get relief right away because we have yet another election cycle approaching. Unless there are further questions, I'll reserve the remainder of my time. Thank you. Roberts. Thank you, counsel. Mr. Feigin. Thank you, Mr. Chief Justice, and may it please the Court. I'd like to begin, if I could, by addressing Justice Kagan's question, which Justice Sotomayor then followed up on. We think that the probable cause finding and the fact that they want to repeat essentially the speech that was made earlier are the two critical factors in this case, and without that, none of their claims would be justiciable. As it is, we think that their purely legal First Amendment challenges are ripe for those particular case-specific reasons. Roberts. Well, you insist that they — there has actually been a probable cause finding that their speech would violate the law before they would have standing? Not necessarily that their particular speech would violate the law, but that there have been — without the probable cause finding, it would simply be speculative whether a particular speech would actually result in any sort of enforcement  One critical aspect of this case is that it's a case that's not justifiable without the probable cause finding. It's a case that's not justifiable without the probable cause finding. It's a case like this where the procedures can be triggered by any citizen in the State? Well, Your Honor, again, I — we don't think that someone can come into court and say, I want to make some speech. I don't think that speech would be violating the statute. I don't have any good evidence that anyone else thinks my speech would be — would violate the statute or that some sort of enforcement action would be brought against me. But nevertheless, I want to get into court and — Is that a realistic proposition? I mean, first of all, in the first place, surely you don't expect them to come in and say, I'm going to say something totally false, and I'm afraid I might be prosecuted for that. But then you have to say they have — you would never imagine that somebody else might think in a hotly contested election that their speech is false? Well, Your Honor, we may be simply debating how similar the previous speech that has — that was the subject of a probable cause finding or that there's some other reason to believe will be the subject of enforcement proceeding has to be to the speech that the plaintiffs allege that they intend to make. But we definitely don't think that a plaintiff can simply come into court and say, look, I want to make this speech, I don't think it violates the law. What would happen, Mr. Fagan, what would happen if a candidate knew, it seems actually quite plausible that Representative Driehaus would know, that this was something that Susan Anthony or some other like group would talk about in his campaign, and he were to write letters to all these groups saying, if you start advertising in this way, if you put up billboards, I'm going to take you before the Ohio Commission. Would that be sufficient? So that would at least be sufficient, Your Honor, to bring a suit against Driehaus that would be kind of similar to the situation in MedImmune against Genentech, which was a civil suit that the putative defendant had standing to bring a declaratory judgment action to prevent. I'm not sure I understood that. Is it sufficient that somebody has said, I'm going to bring an action against you before the commission, but there's been no prior commission determination as to this speech, it's just somebody saying, I'm going to go to the commission and raise this with them if you start speaking in this way, would that present a credible threat? That specific threat would be enough to allow for a lawsuit. Now, Your Honor, I think there would be a significant question whether the suit could only be brought against Driehaus, who brought the threat, or whether you could also join in the commission. But as a practical matter, that wouldn't really make much difference, because if constitutional claims were raised in that proceeding, the district court would be obligated to inform the State of Ohio, and the State of Ohio would be entitled to intervene in the litigation.  Kagan. Kagan. Kagan. Now take it just a step further. Surely there are some kinds of statements or, I don't know, maybe surely is the wrong word. Are there some kinds of statements where even though the representative doesn't say, I'm going to do this, you know that somebody is going to do this, whether the representative or somebody else. It's the kind of statement that given this process, it's just going to require too much fortitude to resist the temptation to bring this in front of this commission. Well, Your Honor, I think in the absence of good evidence of an enforcement proceeding, it would simply be too speculative. But I would add that in this particular case, the credible threat of enforcement test might be relaxed to a certain extent, because this is a private attorney general statute.  And I would add that there is no wider range of circumstances than would be possible under most Federal laws, for example, which are enforced solely by the executive. And that might be a reason, a case-specific reason why your hypothetical might have more salience here than it would in the Federal context. Another difference between this and the Federal context is we don't have any potential statutory barriers to bringing this action. Congress hasn't decided to provide a cause of action only for, for example, final agency action as it did in the Administrative Procedure Act, and it's not attempting to channel these claims through a particular agency. Are you arguing that the other organization, COAST, also has a standing? Because you seem to require for the credible threat for there to have been a proceeding before the commission, and there's been nothing with regard to the other organization. So, Your Honor, we don't think the proceeding before the commission has to involve the entity that wants to make the speech in the future. It's enough that it involves speech similar to the speech that the plaintiff is alleging that the plaintiff intends to make. So how do you distinguish the three in Younger v. Harris that the Court said didn't have standing? I think in the same way that Petitioners do, Your Honor, and I think that's how we reconciled the case with Stefel, where one of the factors the Court looked to to find a credible threat of enforcement in that case was the actual prosecution of the plaintiff's hand-billing companion. One thing I would emphasize about this case is that in this particular context, this unique Ohio scheme, the administrative proceedings before the Ohio Elections Commission are the relevant enforcement proceedings. It wouldn't normally be the case that administrative proceedings that can result only in government speech would be considered enforcement proceedings for that purpose. But in this particular circumstance, not only can the Ohio Elections Commission recommend a case for further prosecution, but a decision by the Ohio Elections Commission is a decision by a neutral decisionmaker following a full-dress adversary proceeding that someone has violated Ohio criminal law by knowingly misinforming the electorate in the context of a political campaign. In that particular context, and particularly as to entities like Petitioners that engage in political advocacy on a regular basis, that kind of finding is a significant sanction. And in fact, the State itself views it that way in two relevant ways. First of all, such a finding by the Commission is treated as an adverse effect for purposes of the statute that allows for judicial review. And second of all, if you look at actual orders by the Ohio Elections Commission, they sometimes refer to the finding of a violation in particular cases as a penalty. Before my time's up, I would like to address a few things Petitioners said about the justiciability, for example, of as-applied challenges under this Court's decision in Holder. I think it's very significant that in Holder the Court noted that there were — Holder Against Humanitarian Law Project, the Court noted that there had been 150 prosecutions brought under the statute that the plaintiffs in that case were challenging, and that many of them had involved the same provision. And we think that's a circumstance in which there would be a credible threat of prosecution because the plaintiffs had showed a pattern or practice of prosecution of similar conduct. How many proceedings have been brought under this Ohio statute? So under the Ohio statute, between 2001 and 2010, according to the statistics in the green brief by the Ohio Attorney General, it's a little bit over 500. And that's just for violations of this false statement law or asserted violations of this false statement law. And any breakdown of whether those were brought by candidates or just interested citizens? The — we don't have statistics on that, Your Honor, and the brief doesn't break it down. The Court has no further questions. We'd ask the Court to partially reverse and allow only the purely legal, ripe legal challenge to these laws to proceed. Roberts. Thank you, counsel. Mr. Murphy. Mr. Chief Justice, and may it please the Court. The Court should affirm the Sixth Circuit's judgment in this case because Petitioners have not established a credible threat of criminal prosecution, and any other injury to the extent it is adequately alleged is not certainly impending. And I'd like to begin with the prior probable cause finding. Petitioners repeatedly characterized the prior probable cause finding as a finding by the prior panel that the speech at issue there was probably criminal. That's not what the finding indicated. It's a very, very low standard. It's not a standard that — it's well below preponderance of the evidence. So probably criminal is way too high. It's analogous in the civil context to a malicious prosecution case. One of the elements is to establish that a prior case lacked probable cause. Are you prepared to represent to us that if they do the exact same thing, the next election that they did in the last one, that you will not take action against them? No. I'm not — I have not — I do not have authority to disavow, but their — their argument that you need to disavow is inconsistent with some of the Court's cases suggesting that the threat implied by the existence of a law itself is not sufficient. And so they fall back on this probable cause finding as suggesting that it creates the objective evidence necessary. But because — because the probable cause finding is so low, and because there are so many steps between the probable cause finding and a potential criminal prosecution, it's a— Scalia, the criminal prosecution isn't all that they're complaining about. They're complaining about having — having to be dragged through this same — this same proceeding next time in the midst of an election campaign. And however minimal the finding that is ultimately made may be, they are going to be subject for sure to that proceeding in the next election campaign. And I don't care if — if all the commission says is, you know, there's some reason to believe that they were lying. Even if it's that minimal, you are forcing them, and it's pretty sure that it's going to happen, because somebody will complain, the candidate they're criticizing, you're forcing them to go through this procedure in the midst of an election campaign, right? Well, with respect, Your Honor, I think there's a couple answers. First off, I think it's speculative if you look at the complaints. The SBA, this complaint, simply says they would like to engage in substantially similar activity in the future. Now, you have to keep in mind what that activity was. They weren't challenging anybody who voted for the Affordable Care Act. They were challenging specific congressmen. At JA113, it says certain congressmen. That's in their complaint. Scalia, your organization is not an anti-Dreehouse organization. Was that its name, Dreehouse? Yes, Your Honor. That's not what they're about. They're about opposition to the abortion funding portion of the Affordable Care Act. And they are going to make the same — the same contentions against anybody else who runs for office who has voted for that act. Whether it's Dreehouse or anybody else. Well, with respect, the people that they targeted in 2010 were only pro-life Democrats who originally voted against the Act and then changed their vote in response to the executive order. This is at JA52, when they announced their voters have consequences bus tour. It wasn't against everybody who voted for the Act. But your very argument, Mr. Murphy, to the effect that, well, probable cause is a very low standard, seems to me to work against you. It means that more complaints are more likely. Well, it depends on what you're talking about the relevant injury is. If the relevant injury is a criminal prosecution, I think it very much shows that a prosecution is entirely unlikely. And if your relevant injury is some of these preliminary injuries that they're asserting, I do think that the credible threat test is probably not even the test, because as the Court said in Clapper, injuries in that context had to be certainly impending. Well, but this is a point brought up by Justice Scalia's question as well. Don't you think there's a serious First Amendment concern with a State law that requires you to come before a commission to justify what you're going to say and which gives the commission discovery power to find out who's involved in your association, what research you've made, et cetera? Well, remember that the issue here is standing. So setting aside the First Amendment concern should have no impact into whether an Article III case or controversy exists. They repeatedly. Breyer. I mean, why can't a person say, you know, there are things I want to say politically. And the Constitution says the State does not have the right to abridge my speech, and I intend to say them. And if I say them, there's a serious risk that I'll be had up before a commission and could be fined. What's the harm? I can't speak. That's the harm. Right? So why isn't that end of the matter? Well, the Court has repeatedly said the chilling effect by itself is not the harm. The relevant harm in your hypo would be. Why shouldn't it be the harm? That is, whatever, as any court case said, when somebody says, we're taking extreme, you want to speak in a campaign? And we have a law here that if you do, we'll throw you in jail. And you really do want to speak, and the law really does prevent you from speaking. Why shouldn't that be the end of it? Well, remember, the test has to be a credible threat of prosecution. What the Court's saying is there is a statute, not a statute, is there a case which says the little syllogism I just went through is not the law of the United States? Now, there may be. That's why I asked the question. So I think the closest case would be Golden, for instance, where the Court clearly indicated, and I quote, The Constitutional question, First Amendment or otherwise, must arise in the context of a specific life previous. Ginsburg. But that was a very special situation. In Golden, they were going out after a particular candidate. It was not — it was not a political view that an organization is taking, and they are not targeting this particular candidate, but they are targeting that issue, any candidate who supports that issue. Well, with respect, Your Honor, in Golden, the plaintiff clearly indicated that he was targeting that congressman because of the congressman's votes on — for a particular care package. But didn't the Court say that there wasn't — once that congressman wasn't going to run for office anymore, there was no suggestion that they wanted to talk about somebody else? So he did have suggestions that he wanted to engage in substantially similar activity in the future, but they didn't identify any other candidates, just like they  any candidates in the Rene decision, which was the one that the Court found to be too speculative. And so I think that's significant, because I think, by analogy, that would suggest that we — the only single forward-looking allegations in SBA's complaint, a JA-122, are that it plans to engage in substantially similar activity in the future. The other thing that the Court found was that there was no credible threat of prosecution, which was part of the reason why the Court found the case on right there. And the committee — You said there was no credible threat of prosecution, but what about the harm that is occurring — Mr. Carvin said it's a very short time, they're brought before the commission, and they have to answer this charge that they lied, that they made a false statement. And that's — just that alone is going to diminish the effect of their speech, because they have been labeled false speakers, and it costs money to defend before the commission, right? Is it — that's not — Well, keep in mind that the reputational harms they've essentially asserted for the first time in this Court, they didn't assert any type of reputational injuries in the Sixth Circuit, and I think it would be entirely speculative to suggest that those would exist here with respect to these organizations. Well, I'm not sure it's a reputational harm. I mean, why isn't, as Justice Ginsburg suggested, the relevant harm the probable cause determination itself? There are voters out there, and they don't know that probable cause is such a low bar as you describe it. They think probable cause means you probably lied. And that seems a reasonable thing for them to think, and that's a relevant harm. And we should just — you know, we don't even need the prosecution to serve as the relevant harm. That seems quite enough. They did not rely on any type of that type of harm below. And I think it's — a harm flowing from the misrepresentation of what the probable cause finding means, I would think you'd have to allege more than they have here with respect to that it would exist in this case. There was no — they had — there was no misrepresentations by SBA lists, for instance, that this probable cause finding meant that they probably lied. They told their supporters, it's in the Joint Appendix at 74, 75, that all it meant was that you go — that they found that you have to go before the full commission. They didn't say to their supporters that you probably lied. Roberts. I guess it was in the case of Coast, the problem is other people are going to be intimidated from helping them engage in their political speech. What was it, a billboard? The billboard company said, I'm not going to let you put your sign up on my billboard. I might be liable. So, I mean, they may have a certain fortitude in proceeding based on all the reasons that you've given, but they need third parties to help carry out their message. And there's no reason to think those third parties have any commitment to their political message at all. And the slightest whiff of, oh, this is going to be legal trouble, they say, forget about it. I guess, two responses. Keep in mind that at J27 in the letter to Lamar, Driehaus indicated essentially that we reserve the right to proceed against you in the commission or in a court of law, indicating that he was already contemplating the defamation action. So if this statute, talking about the redressability prong of standing or the directness of the test with respect to rightness, he could have said the exact same thing and it would have chilled Lamar from the bottom of his heart. Roberts. Sotomayor, a defamation action, people sue everybody all the time. No one's going to take that seriously. In fact, it's probably going to redound to the benefit of SBA and COAS to say the Congressman is, you know, bringing a defamation action and highlights it. But it's another thing to have the State involved, making a determination that there's probable cause that you lied. Scalia, I mean, the mere fact that a private individual can chill somebody's speech does not say, well, since a private individual can do it, you know, the Ministry of Truth can do it. That's not the law. Well, the law of that – so that's the First Amendment question, it seems to me. On the standing question, it's whether this harm would have come about absent this law. And the fact that he notified the company that they might be thinking about a defamation action suggests that it's entirely speculative that it would have come about absent this law. There's a curious inversion here. Usually we're concerned about citizen suits. Too many people can challenge the law. Here, we're concerned that many, many citizens can bring the challenge against the candidate. So it's somewhat reversed. In other words, you have tens of thousands of private attorney generals waiting to pounce and get these people to board the commission and have to follow discovery orders. Well, I mean, that's true, but keep in mind that when you think about the fundamental Article III purposes here, separation of powers and Federalism purposes, it seems to me that a finding in this case that they have standing would undermine those. With respect to separation of powers, the Court has repeatedly said that courts are not, in our constitutional system, are not roving commissions assigned to pass judgment on the validity of the nation's cause. Sotomayor, do you know, of the 500 cases that you mentioned earlier, how many actually ended up in full prosecutions? So there's a – since 1996, when the statute was amended to allow for this pre-enforcement process, there have been five referrals, and then of those five referrals, three plea agreements. So there's only been three. Three what, I'm sorry. Three plea agreements at the end of the – so there was five referrals from the commission to the relevant prosecutor, and then of those five cases, three charges were brought and plea agreements were essentially entered immediately. So that just also goes to show that the credible threat of any criminal prosecution is very unlikely. Well, how many of those, do you know, were mooted out by the election? Well, there's the proceedings are going on and people's speech is being chilled and it's back and forth. Then the election is over and people say, oh, forget about it. How many of the overall number of? 500. You gave us some answers about how many of the 500 resulted in criminal prosecutions. And all I want to know is how many of the 500 proceedings were mooted out by the fact that the election took place. So I do – so roughly 40 percent, 60 percent, there's a finding of no probable cause. That leaves 40 percent. And of those, you know, Your Honor, I don't know the statistics on the number of dismissals. I would say that there are a substantial number. Breyer, what would you say as a lawyer? You're now a lawyer for the commission. You understand it better than I. I'm just making up an example. Do you think they'd prosecute this or not? Somebody walks in front of the house of a political opponent and has a big sign that says murderer. Now, when asked, you say, but he voted for legislation that led to the death of many cats. What? Would they prosecute that or not? Well, I think, Your Honor, it might fall within – it depends on the person. I just want to know your opinion as the lawyer for the commission. Do you think that's going to be prosecuted or not? I think the – I would say probably not, but that's just my personal – Probably not. Personal opinion, because they would say that you would adopt the rule from the defamation context that if it can be interpreted under either as hyperbole or either as a reasonable interpretation of an ambiguous statement or where the – if there's any interpretation of the statement that is ambiguous where it's true, it would fall within the defamation rule that it can't be considered false within the meaning of the statute. So the murder hypo, if it's actually he is a murderer of cats, it might mean that it's misleading. Why did they prosecute this here? I mean, we've heard in other cases, you know, just recently a very major case where people really believed about the same thing and they were sincere in their beliefs. So why did they do it? The commission has now fully conceded that it would be a difficult proposition in this case, certainly. But I think it's the preliminary nature of the probable cause finding that is – But why don't the statistics that you provided us portray a system that really limits core First Amendment speech without providing much of an opportunity for judicial review? If you're correct about Article III here, where you have a system where thousands of complaints are filed and yet, in the end, there are very few prosecutions. And you say, well, the filing of the complaint isn't enough and the probable cause determination isn't enough. So you have this system that goes on and on, year after year, where arguably there's a great showing of core First Amendment speech, and yet you're saying that basically you can't get into Federal court. Well, we're not saying that, Your Honor. I think we're just saying you can't get into Federal court in this case. And I do think that this – those chilling effect concerns should not play a role in the Article III case or controversy. Well, but how would you get into Federal court? I mean, your own office expresses grave concern about the constitutionality of this statute. So that suggests somebody should be able to get into Federal court to do this. But I don't see a way where you would allow a pre-enforcement challenge. One would have to go through the entire process and get to the end of it and get a judgment to enable a challenge under your theory. Is that right? Well, I think under our theory, it really depends. There's two types of cases that are broad. One is a case like Babbitt, where they're saying the law is ambiguous. It could mean A or it could be – it could mean B. If it means A, my speech is covered within it. There, all you essentially have to do is allege you want to engage in the speech that would fall within the rule. But that's not what they're doing here. They're saying their speech falls completely outside this law, this unambiguous law, the distinctions between false and true, but we're going to get prosecuted anyways. And in that context, I think you do have to allege what the government suggests is more objective evidence that you're going to be prosecuted. Breyer, I had a reason for asking what sounds like a silly hypothetical, but a possible one. We understand how people take different views on that. And then you have a hard time, it seems to me, distinguishing this case from that one in terms of their exercising their authority. And so at least must raise a question, a First Amendment question, on the merits. It seems pretty serious. So if you lose on this procedural matter, how quickly can you get this decided? I mean, there are elections coming up. People would like to know. They want to know what they're supposed to say. And how long is all this procedural skirmishing going to take, which in and of itself is an obstacle to what they might say in the next election? So procedural skirmishing, you're talking about? I mean, you're saying, well, they don't have standing. I think I used to, you know, I was interested in this field of administrative law, and even my class, despite the scintillation, would sometimes go to sleep when I got to such questions. So I'm saying that these seem to be preliminary questions on a matter in respect to which there seems serious doubt. I'll repeat myself. The elections are coming up, and people have to know what they're supposed to say and what they can say and what they can't. So how do we get this decided? Well, it seems to me your question is, the question is suggesting that the underlying law is, is there's serious doubts about the constitutionality of the underlying law. And that doesn't provide any basis. The entire purposes of Article III's case-or-controversy requirement is to ensure that courts only decide constitutional questions in concrete cases and to allow the merits to slip into the Article III question fundamentally undermines the standards of the article. Breyer. Well, I'd say one of the purposes of standing is to allow people who are really going to be hurt to be able to be hurt in court. Well, of course, if they're not going to be hurt, there's no reason. And what the merits discussion is designed to suggest is that there are real people who would really like to speak in an election campaign, and if they feel they can't, they are really being hurt. That's what the other side is arguing. And I've listened to the argument. I'm curious as to the practicalities. If they're right, when is this going to be heard and decided in your opinion? So the – are you talking if there's a remand in the district court? You tell me how to do it. Well, I think the case should be dismissed, obviously. I'm saying if you were to lose on this. Okay. If I was to lose, oh, you could – frankly, if you remanded finding a concrete case here, you could instruct the district court to certify to the Ohio Supreme Court, for instance, which could give an immediate authoritative interpretation of the law, and it could include all the relevant narrowing constructions that this Court has. Well, that'll speed things up. You want to – you don't even want – you don't even want the district court to decide it. You want to go through a certification process that will bring in a whole other court system. But it has to decide the scope of the law. As United States v. Williams said, to determine the constitutionality of the law, you need to know its scope. And the entire suggestion here that their speech is covered suggests that the scope of the law is much broader than the Ohio Supreme Court could interpret it to be. What narrowing construction would be consistent with Alvarez? Yeah. I can't understand what that would be. It has to be really false? Is that it? Well, I think – I think Alvarez is completely distinguishable as being about false statements in the abstract. This Court already held in McIntyre that the State has a compelling interest in policing fraud and libelious statements in the election context because of the risk to the public from those statements. Alvarez wasn't about false statements in the abstract. It was a criminal prosecution for making particular false statements. And they were as hard, factual statements as you will ever find. Did somebody receive the Congressional Medal of Honor or not? No, I agree with that it was a false statement, a verifiable fact, but it was a false statement anywhere, anytime, even, like, at home. If you make the statement, it could be covered. What we're saying here is that false statements in the election context, the State has a much more compelling interest in that context because, as the Court said in McIntyre, the – the false statements can have an impact on the election. Of course, there's false positives if the commission gets it wrong, but think about the false – the false negatives that slip through when somebody is making a false statement, and that actually impacts the campaign, leading to somebody voting for somebody else. Sotomayor How are you ever going to prove that one false statement costs somebody in an election? What's that? How are you ever going to prove that one false statement costs somebody in an election? Well, we – I don't think we have to prove that to get a conviction in any case. I think we just prove that their false statements can have impacts on elections, and that shows the interest in this case as compared to the interest in Alvarez, in which the false statements could be made at any time, under any circumstances that wasn't narrowly tailored to the election context. Do you think the allegedly false statement here was a false statement of fact? I think there's a good argument that it was not, that there was a false statement of – that there's reasonable interpretations of this ambiguous Affordable Care Act, and if so – And there's a good argument on the other side, but it's an argument over a fact, isn't it, whether this person was responsible for the Affordable Care Act? I mean, that was the charge, you know, that this person made the decisive vote, right, in the – Well, that's a different case. This charge was he voted for taxpayer-funded abortion was the charge. And so it's whether this Act covers – By voting for that Act. For the Act, yes. So it's whether the Act covers taxpayer-funded abortion, and that's a complex question that if the Court were to – if the Ohio Supreme Court, through certification, were to adopt the Bose standard, it would suggest that it might not be covered, because the Bose standard suggests that speech about an ambiguous topic cannot be false under the actual malice standard. So this whole speech could be, through certification, eliminated and the statute narrowed to cover only false statements of verifiable fact. Then all you have to do is litigate it, that's all. You know? You make the statement, and then, you know, you can litigate it on the basis of whatever the Ohio Supreme Court says. Right? Well, I mean, let's litigate whether it's factually inaccurate or legally inaccurate. Right? It's a lawsuit. So we're talking about the scope of the law, correct, Your Honor? Yes, we are. But, I mean, we're talking about whether this law imposes limitations upon the freedom of speech. And if you say, whenever you do it, you're going to have a lawsuit, you're going to be held before this commission, you may have a good case, you may not have a good case, but you have to justify yourself to this commission before you can make the assertion. Well, that's not true. That doesn't happen in every case. You're making it sound like the commission hears every political statement out there. But it has to be filed by a person, and only one person filed a complaint against the SBA last time, and he is in Africa now. So I don't think he'll be filing complaints any time soon. Really lost, didn't he? I see my time is up. I just asked the Court of Firms. Nina said he really lost. Thank you, counsel. Mr. Carvin, you have 5 minutes. A few brief points. I think the key point to take away from the colloquy with Mr. Murphy is that when he was asked how do you bring a pre-enforcement challenge, his only solution was to admit you're lying before you speak. Well, obviously, that completely defeats the value of your speech. No speaker is ever going to do it. You're not going to confess to a crime before you speak. And I would point out in Babbitt, they didn't say they were going to lie. They said just the opposite, and they nonetheless had standing. On the certification point, further delay in the Ohio Supreme Court for limiting construction that we don't want, that can't possibly do it. After Alvarez, this fact-opinion distinction is of no legal relevance. We don't want a limiting construction. We want to say that anything, fact or opinion, is unconstitutional to limit under the false statement law. I'd point out that we did litigate in front of this very same district court judge the fact-opinion issue in the libel case, where it does have some resonance, and he's already found that our assertion was factual. So we don't want to go on that tangent. If the Court would just look at Dombrowski and Citizens United, those cases articulate as well as any can. When you're making a facial challenge to a First Amendment, the last thing you want to do is abstain to State court judges because you actually exacerbate the constitutional injury through the delay and the fact that you've got to go through declaratory judgments. When our entire point is it's unconstitutional for us to say, Mother, may I, before we speak. As to Mr. Murphy's attempt to downplay the probable cause finding, on 7a attached to their brief, they have what the probable cause finding is, and it says that there is probable cause to believe that there has been a violation of a law alleged that the complaint has occurred. Under this Court's probable cause determination, that means reasonable people would believe that a violation has occurred, even though you need to show it by clear and convincing evidence, and even though my opponent claims that any reasonable interpretation of this law is not false. Well, that means that they've already found that through clear and convincing evidence, we are advancing not only a false but an unreasonable interpretation of the ACA, which simply, of course, exacerbates the credible threat. I think my final point will be, he says, well, two things. One is he says we didn't allege with specificity the kind of speech that we were going to say in the future. We said we're going to engage in the same or similar speech. I don't think the language, English language, permits a more direct and precise articulation of what we're going to say in the future. The only difference will be, instead of Representative Driehaus, we will substitute Representative Capter, another pro-life Democrat in Ohio who we have already criticized for her vote on the ACA and which we would have repeated in the 2012 election cycle, but for the chilling effect. This is obviously completely different from Golden, which my opponent continues to raise, where the Court found that the only interpretation of the facts is that the plaintiff's, quote, sole concern was with the representative at issue who had gone off to a judgeship. It is blazingly obvious that our sole concern is not Representative Driehaus. It is any legislator that voted for an act that we believe devoutly has taxpayer funding and abortion in it. So we are facing a credible threat. We ask the Court to lift this yoke so that we can become full participants in the next election cycle. Unless there are any further questions, I thank you. Roberts. Thank you, counsel. Counsel. The case is submitted.